J.P., a minor, by and through his Parents and Next Friends, Karl PETERSON and Linda Peterson, Plaintiffs,

v.

COUNTY SCHOOL BOARD OF HANOVER COUNTY, VIRGINIA, Defendant.

No. CIV.A. 3:06CV28.

United States District Court,
E.D. Virginia,
Richmond Division.

Aug. 28, 2006.

---

Phillip C. Strother, Krista M. Mathis, Strother Law Offices PLC, The Hillyard–Maury House, Richmond, VA, for Plaintiffs.

Yvonne S. Wellford, Hanover County Attorney's Office, Hanover, VA, Bradford A. King, Harrell & Chambliss LLP, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

This matter is before the Court on the record of a State due process hearing and evidence taken *ore tenus* in the action filed by JP, a twelve year old autistic boy, and his parents (collectively "the parents") seeking, under 20 U.S.C. § 1415(i)(2)(a) of

the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, to overturn the October 14, 2005 decision of a State Hearing Officer. In that decision, the State Hearing Officer held that the individual education plan ("IEP") provided for JP for the 2005–2006 school year by Hanover County Public Schools ("HCPS") satisfied the requirements of the IDEA and governing decisional law.

## The IDEA

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." § 1400(d)(1)(A). To achieve this purpose, the IDEA extends federal funding to the States to provide disabled schoolchildren with a "free appropriate public education" ("FAPE"). § 1412(a)(1)(A). A FAPE is provided by school districts in public schools in the so-called "least restrictive environment"—*i.e.* the educational environment suitable for the disabled student that is most similar to the public school environment in which non-disabled children are educated. § 1412(a)(5); *Schl. Bd. of Prince William County v. Malone*, 762 F.2d 1210, 1213 (4th Cir.1985). However, where the public school district is unable to provide a FAPE in the public schools, the IDEA requires that the school districts shall assume the cost of educating the child in a private school that meets the child's educational and social services needs. § 1412(a)(10)(B).

A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child ... supported by such services as are necessary to permit the child to benefit from the instruction." *Bd. of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 188–89, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (internal quotation marks omitted). A FAPE is implemented through an IEP, which is designed by an IEP team, consisting of school district educators and administrators, education experts, and, of vital importance, the child's parents. IEPs "must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *MM ex rel. DM v. Schl. Dist. of Greenville County*, 303 F.3d 523, 527 (4th Cir.2002); *see* § 1414(d)(1)(A).

The IDEA establishes detailed procedures for IEP development and review. If a dispute arises over the sufficiency of an IEP, the statute requires the parents to notify the school district of their complaints, enter into mediation, and, if that is not successful, allows the parents to bring a due process action before an impartial state or local administrative hearing officer. §§ 1415(a), (b)(7), (e), (f). A party aggrieved by the decision of the hearing officer may file a civil action in a state or federal district court. § 1415(i)(2).

To provide an "appropriate" education within the meaning of the IDEA, the school district does not have to provide the child

> with the best possible education. And, once a FAPE is offered, the school district need not offer additional educational services. That is, while a state must provide specialized instruction and related services sufficient to confer some educational benefit upon the handicapped child, the Act does not require the furnishing of every special service necessary to maximize each handicapped child's potential.

*MM*, 303 F.3d at 526–27 (citations and internal quotation marks omitted). However, "Congress did not intend that a school system could discharge its duty under the [Act] by providing a program that produces some minimal academic advancement, no matter how trivial." *Hall ex rel. Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir.1985). Setting the substantive standard, the Supreme Court has stated that an IEP is sufficient if it is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. In this action, the Court must assess, based on the applicable standard of review, whether the June 2005 IEP was "reasonably calculated to enable [JP] to receive educational benefits." *See Rowley*, 458 U.S. at 207, 102 S.Ct. 3034.

## STATEMENT OF FACTS

The findings of fact found herein come from three sources: testimony received by the State Hearing Officer in the summer of 2005, testimony received during an "additional evidence" hearing held before this Court on July 20, 2006,[1] and the record compiled during these hearings.

JP, who was born on January 4, 1994, resides with his parents, KP and LP, in Hanover County, Virginia. At age 18 months, JP was diagnosed with autism, a condition recognized as a disability under the IDEA.[2] "The main characteristics that differentiate autism from other developmental disorders include 'behavioral deficits in eye contact, orienting to one's name, joint attention behaviors (*e.g.*, pointing, showing), pretend play, imitation, nonverbal communication, and language development.'" *Amanda J. ex rel. Annette J. v. Clark County Sch. Dist.*, 267 F.3d 877, 883 (9th Cir.2001) (citing National Research Council, Educating Children With Autism 20, Catherine Lord & James P. McGee, eds., National Academy Press 2001). Autistic children may often seem to be lost in their own worlds, impervious to stimuli to which typical children react. Due to this behavior and their deficits in imitation, attention, and language skills, autistic children often must be taught how to learn in the manner that typical students learn.

JP's family moved to Virginia in late 2000, and JP began as a first grader at Battlefield Park Elementary School in Hanover County in January 2001. JP stayed in HCPS's special education program from January 2001 until May 7, 2003. During this time, he repeated first grade.

In May 2003, the parents removed JP from HCPS and placed him at the Spiritos School ("Spiritos"), a private specialty school for children with autism, because the parents were concerned that JP was not making adequate progress in the special education program at Battlefield Park. To teach autistic students, Spiritos uses a technique called applied behavior analysis ("ABA"). Using intensive one-on-one instruction, ABA seeks to teach autistic children the basic learning skills needed to learn academic subjects. Testing by Dr. Micheal Hayes, a clinical psychiatrist, revealed that JP made significant gains in all areas tested using the Woodcock Johnson

---

**1.** *See* 20 U.S.C. § 1415(i)(2)(B)(ii).

**2.** The Code of Federal Regulations defines autism as:

a developmental disability significantly affecting verbal and nonverbal communication and social interaction, generally evident before age 3, that adversely affects a child's educational performance. Other

characteristics often associated with autism are engagement in repetitive activities and stereotyped movements, resistance to environmental change or change in daily routines, and unusual responses to sensory experiences.

34 C.F.R. § 300.7(c)(1)(i).

III ("WJ–III"), Verbal Motor Integration ("VMI"), and Peabody Picture Vocabulary Test III ("PPVT–III") tests. *See* App. C (charting JP's scores on those tests from 2003 through 2005). Nonetheless, the parents wanted to return JP to the HCPS system. JP's older brother, who is not autistic, attended HCPS, and the parents testified that they were pleased with the brother's education and wanted JP to succeed in the public school system, just as they were desirous for HCPS to succeed with JP.

Therefore, as provided by the IDEA, an IEP team, including the parents, convened in the summer of 2004 to design an appropriate IEP for JP. The product of these meetings was an IEP signed August 17, 2004 ("2004 IEP"), which placed JP in a special education program at Rural Point Elementary School ("Rural Point"). The parents testified that, because they had felt HCPS had not provided JP with an adequate education at Battlefield Park, and having experienced JP's success at Spiritos, they sought to obtain an educational program at Rural Point that would use many of the same methods used at Spiritos.

The IEP, therefore, incorporates part of an agreement reached between HCPS and the parents that resulted in the settlement of a due process challenge by the parents wherein the parents claimed that HCPS had denied JP a FAPE during his year at Battlefield Park and thus sought reimbursement for the costs of his year at Spiritos. The claim was settled before the due process hearing on that dispute was held, and the settlement included a monetary award as well as settlement terms. The terms of the settlement agreement became significant parts of the IEP and a considerable part of the parents' case focuses on the terms of the agreement. (*See* HCPS–3, p. 29b, 29c.)

Under the August 2004 IEP, JP attended a regular 4th grade classroom for home room, recess, lunch, music, and art. A special education teacher taught JP reading, writing, and math in a so-called "self-contained" classroom that was especially designed for the instruction of autistic children. As set forth in the settlement agreement incorporated into the IEP, JP's classroom included small, partitioned learning areas, special sensory tools that aid in keeping autistic children focused, dimmed lighting, and a special swing and oversized ball that many autistic children use to reduce anxiety and overstimulation. Also, as set forth in the agreement, JP was to have a one-on-one teacher's aide who would be trained in the use of the discrete trial method and who would provide assistance in all of JP's activities, including reading, writing, mathematics, and daily living/social skills. In addition, JP received speech therapy five times per week, including once in a group session, for thirty minutes each and thirty minutes of occupational therapy per month.

As proposed, the August 2004 IEP had 18 goals. At the August 17, 2004 IEP meeting, three of the goals were deleted at the parent's request (goals 11, 13 and 14). At an October 20, 2004 meeting, a new goal 12 was inserted, and goal 13, dealing with writing motor skills, and which seemingly had previously been deleted, was added back. The 2004 IEP described JP's present level of performance, and it included several accommodations that were to be made for JP. These accommodations read as follows:

- direct one on one instruction to include opportunities for discrete trials where appropriate.
- structured environment with visual schedule
- short clear directions and wait time provided

- Teacher/aid to maintain attention to task, model, modify, and reinforce
- Therapeutic Listening
- Sensory Diet (to be developed, revised, and monitored by the OT who will consult with the SPED teacher and 1:1 aide.) Consult with OT.
- Trained instructional assistant* * to support J[P]'s program. Training will entail methods such as repetition, data collection, step by step methods, that is proven to work with children with autism. HCPS will arrange for the aide to receive training from a Certified Behavior Analyst from a program such as Faison School or a comparable program in Fredericksburg with which HCPS is already conducting similar training sessions.
 - • * * The aide will be supervised by the Special Education teacher and will provid [sic] instruction to James at the teacher's, the occupational therapist's and/or the speech therapists direction.

(2004 IEP, p. 24.)

The nine provisions that were part of the settlement were added as an addendum to the August 2004 IEP. (*See* 2004 IEP, p. 29b,c.) Included among the provisions are:

2. J[P] will receive support from a one-to-one instructional aide who receives training in methods that are proven to work with children with autism. HCPS will arrange for the aide to receive training from a Certified Behavior Analyst from a program such as the Faison School or a comparable program in Fredericksburg with which Hanover County Public Schools is already conducting similar training sessions.

3. The one-to-one aide will serve James at all times that he is involved in school work or activities. The aide will be supervised by the special edu-

cation teacher, and will provide instruction to James at the teacher's, the occupational therapist's, and/or the speech therapist's direction.

4. J[P] will receive academic instruction in a self-contained setting. The setting will include will include opportunities for J[P] to receive discrete trials when and where the instructional personnel deem appropriate all, of course, designed to meet J[P]'s individual educational needs[.]

\* \* \* \* \* \*

7. Hanover School Board policy invites and encourages parents to be involved closely with their students' education, including making visits to classrooms to view the academic environment. HCPS appreciates the P[ . . . ]s' willingness to coordinate their visits through J[P]s' special education teacher and/or through the school administration to limit any disruptions to J[P]' and other students' learning.

(*Id.*) The parents signed the August 2004 IEP as well as the October 20, 2004 additional goals.

JP began at Rural Point in September 2004, with his curriculum based upon the IEP. Later in September 2004, the IEP team agreed to conduct additional evaluations, which led to the addition of the sensory-motor skills goal (goal 13), and, on October 4, 2004 a so-called "sensory diet" was added. On October 20, 2004, the IEP team, including the parents, met to discuss JP's adjustment to Rural Point, to assess behavioral problems he was having, and to adjust his goals accordingly. As a result of this meeting, a Functional Behavioral Assessment (HCPS–38) was ordered; and, it was completed November 22, 2004. On November 22, 2004, HCPS psychologist Michael Warner completed a psychological evaluation (HCPS–30) in which he recom-

mended numerous strategies to reduce JP's agitation, negative behaviors, and frustration. Also, on November 22, JP's speech therapists at HCPS completed an Oral Motor Assessment (HCPS–37) that the parents had requested in September. On December 1, the IEP team added an IEP addendum to implement a Behavior Intervention Plan/Positive Behavior Support Plan (HCPS–39). Additional IEP meetings were held on December 9 and January 1, 2005.

On February 8, 2005, unsatisfied with JP's progress at Rural Point, the parents filed a complaint with HCPS requesting the credentials of all HCPS personal working with JP. Several IEP team meetings were held thereafter. On April 25, the parents requested a Speech and Language Evaluation, which was completed by HCPS on May 12 (HCPS–83). On June 16, the IEP team added an IEP addendum to implement mouth exercises for JP recommended in the Oral Motor Assessment completed the previous fall.

At some point in the 2004–2005 school year, the parents requested that HCPS conduct the Assessment of Basic Language and Learning Skills ("ABLLS") test on JP. ABLLS is designed to be a comprehensive test that assesses a child's pre-academic and social developmental strengths and weaknesses. It tests skills such as reading, language, and calculations as well as the ability to imitate, pay attention, and interact socially. Several of the parents' experts testified before the hearing officer and this Court that ABLLS is the only test that comprehensively assesses basic learner skills. Testimony explained that until a child shows that he or she is sufficiently competent at the basic learner skills, that child is not yet ready to move on to a curriculum based on the state standards of learning used by the public schools. During the 2004–2005 school

year, HCPS decided that ABLLS testing was not needed because, in the view of HCPS, it had sufficient data on JP from other non-comprehensive tests. However, after repeated demands for ABLLS testing by the parents and educational experts, HCPS reluctantly agreed to test JP using ABLLS in July of 2005. However, the results of those tests were not used by HCPS, perhaps because the results were not yet available, to propose the June 2005 IEP that is here at issue.

Because JP's progress during the 2004–2005 school year is central to the issue of whether the June 2005 IEP was sufficient under the IDEA and governing decisional law, the facts pertaining to JP's progress will be discussed in full in Part III of this Memorandum Opinion. At this point, it is sufficient to say that, throughout the 2004–2005 school year, the parents remained concerned that JP was not making progress toward the goals set in the 2004 IEP and, due to repeated but unanswered requests for objective data demonstrating JP's progress, they remained dissatisfied with HCPS's unsupported assertions that JP was in fact making progress. Between the middle and end of the school year, the parents came to the view that JP was actually regressing rather than progressing and so informed HCPS. In contrast, the HCPS members of JP's IEP team expressed the view that JP was making sufficient progress. HCPS contends that its belief was based on observations of JP, assessments of his classroom work, progress journals kept by the speech therapists, and anecdotal evidence.

On April 25, the IEP team agreed upon an IEP for the extended school year ("ESY") term that was to run from July 7, 2005 until August 11, 2005. Despite this ESY IEP, the parents took JP on a vacation during July and August of 2005, and so he only ended up having seven days of

ESY. However, six of those days were taken up by the ABLLS testing.

By June 2005, the parents and HCPS had vastly different views on whether the 2004 IEP had provided JP with educational benefit. Both the parents and HCPS based their judgments on their respective views of the progress, or lack thereof, JP had made under during the 2004–2005 school year. On June 16, 2005, the IEP team met to discuss a new IEP for the 2005–2006 year. The parents were of the view that JP needed a more intense, one-on-one curriculum like that provided at Spiritos, and that HCPS had not fulfilled the terms of the settlement agreement that were incorporated to that end in the 2004 IEP. HCPS felt that JP had made progress at Rural Point, did not need ABA-based instruction, and could continue to make progress at Rural Point during the coming 2005–2006 year.

The IEP proposed at the June 16, 2005 meeting is somewhat in the nature of a draft IEP. That is, the June 2005 IEP consists of the 2004 IEP as it stood in June 2005 (*i.e.* less the goals that had been deleted, plus the goals that had been amended or added), plus a statement of JP's current level of performance as of June 15, 2005, plus three goals proposed on June 15, 2005 dealing with language, behavioral self-regulation, and oral motor skills.

Having already removed JP from HCPS to place him at Spiritos for the 2003–2004 school year, having observed JP's significant progress at Spiritos, and having observed that JP had either regressed in certain areas or made no meaningful progress in other areas at Rural Point during the 2004–2005 school year, the parents, at the June meeting, requested HCPS to provide JP with a private placement at public expense at a local specialty school such as Spiritos. HCPS refused this request.

Thereupon, the parties reached an impasse, and the parents rejected the proposed IEP for the 2005–2006 year.

On June 28, 2005, the parents filed their request with the State for a due process hearing. The due process hearing was held on July 25, September 29 and 30, 2004. The delay between the sessions resulted because the parents changed counsel after the July 25 session. In a written decision dated October 14, 2005, the State Hearing Officer held that JP had made more than minimal progress during the 2004–2005 year, and that both the 2004 and 2005 IEPs were appropriate under the IDEA and governing law.

Meanwhile, the parents had enrolled JP at the Dominion School, a small speciality school for autistic children that first opened on September 12, 2005 with a total enrollment of three students, including JP. By the time of the September due process hearings, JP had attended Dominion for two weeks. Dominion uses the ABA method of instruction, and students attend school for 6 hours per day. Dominion administered several tests to JP when he first arrived to determine his present level of performance. At the "additional evidence" hearing held before this Court on July 20, 2006, Mr. P. testified that JP had done extremely well at Dominion and Kristin Mapp, one of JP's Dominion instructors, credibly testified that JP had made significant progress during his year at Dominion.

On January 11, 2005, the parents filed a seven count Complaint in this Court. In Count I, the parents allege that the State Hearing Officer violated their due process rights by failing to adequately consider the opinions of the parents' witnesses, and by refusing to consider the parents post-hearing points of authority while, at the same time, considering the points of authority provided by HCPS. In Count II, the par-

ents allege that HCPS used the wrong assessment tools (*i.e.* education tests) to assess JP and therefore his IEP was improperly designed and inappropriate. In Count III, the parents allege that HCPS failed to implement material components of the 2004 IEP, and such a failure constituted denial of a FAPE. In Count IV, the parents allege that goals three and four of the 2004 IEP were inappropriate. In Count V, the parents allege that JP's condition and social development made socialization and mainstreaming an inappropriate goal that will not provide JP with educational benefit. In Count VI, the parents allege that HCPS denied the parents a meaningful opportunity to participate in JP's education when HCPS barred the parents from coming on Rural Point's campus except at authorized times. In Count VII, the parents allege that the Dominion School was an appropriate private placement for JP during the 2005–2006 school year.

However, at the hearing before this Court, the parents agreed that each of the counts alleged in the complaint go to the question of whether the June 2005 IEP satisfies the standard set by the IDEA and relevant decisional law, and whether they are entitled to reimbursement for the cost of educating JP at the Dominion School during the 2005–2006 school year. They stated they are not pursuing relief for any other claim. Thus, the enumerated counts are really evidentiary points all going toward proving that the 2005 IEP was inappropriate and that the private placement at Dominion School was appropriate. Accordingly, the parents asked this Court to find that JP did not make progress at Rural Point during the 2004–2005 year, that the June 2005 IEP was inappropriate, and that the Dominion School was an ap-

propriate placement for JP during the 2005–2006 school year.[3] With these initial findings of fact in mind, the Court now turns to an assessment of the parents' claims.

## DISCUSSION

### I. The IDEA And Applicable Standard Of Review

#### A. Applicable Version Of The Statute

■ In 2005, Congress amended the IDEA by passing the Individuals with Disabilities Education Improvement Act ("IDEIA"), P.L. 108–446, which became effective July 1, 2005. In their filings, the parties dispute which version of the IDEA applies to this case. The parents rejected the June 15, 2005 IEP on June 15, 2005, filed their due process hearing complaint before July 1, 2005, and filed this action on January 11, 2006. When assessing whether HCPS complied with the statute in implementing the 2004 IEP during the 2004–2005 school year and whether the June 16, 2005 proposed IEP complied with the statute, the IDEA, rather than the IDEIA, applies because the events at issue all occurred prior to the effective date of the IDEIA.

#### B. Standard Of Review Of Administrative Decision

■ Civil actions, like this one, brought under 20 U.S.C. § 1415(i)(2) of the IDEA "are procedurally unique in that they are independent civil actions in which the district court considers the record of the state administrative hearing, as well as any new evidence offered by a party, and makes its own findings based on the preponderance of the evidence." *County Schl. Bd. of*

---

**3.** The determination of an appropriate placement for JP for years following the 2005–2006 school year is not at issue in the current action.

*Henrico County v. Z.P.*, 399 F.3d 298, 304 (4th Cir.2005).

■ "Although the federal action is an independent civil action and not an appeal of the state administrative proceeding, the Supreme Court has made it clear that the district court must give 'due weight' to the state administrative proceeding." *Id.* (citing *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034; *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 103 (4th Cir.1991). The Fourth Circuit has explained that the "due weight" to be given to the state administrative decisions requires that:

> findings of fact by the hearing officers in [IDEA] cases ... be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it.
>
> We are further of the opinion that when fact-findings are regularly made and entitled to *prima facie* correctness, the district court, if it is not going to follow them, is required to explain why it [is] not .... After giving the administrative fact-findings such due weight, if any, the district court then is free to decide the case on the preponderance of the evidence, as required by the statute.

*Doyle*, 953 F.2d at 105 (citations omitted). Whether an IEP is appropriate is a question of fact, and a district court is to independently make factual findings as to an IEP's appropriateness. *Z.P.*, 399 F.3d at 298.

The Fourth Circuit has stated that:

> *Doyle* makes it clear that factual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were "regularly made." Factual findings are not regularly made if they are reached through a process that

is "far from the accepted norm of a fact-finding process."

*Z.P.*, 399 F.3d at 305. The Fourth Circuit has "held that credibility determinations *implicit* in a hearing officer's decision are as entitled to deference under *Doyle* as explicit findings." *Z.P.*, 399 F.3d at 307 (emphasis added).

## C. Weight Due To The State Hearing Officer's Decision

The decision of the State Hearing Officer in this matter is so inadequate as to be of little use. The opinion selectively quotes some statements of IDEA law by the Fourth Circuit and Supreme Court and then purports to recount the testimony of each witness, but does so in terse, conclusory terms and, in most cases, this results in a distorted recitation of what the witnesses actually said.

The opinion also is virtually useless in assessing the credibility of the witnesses because, according to the State Hearing Officer, "I found all the witnesses credible, and all the experts qualified to testify within their fields." (State Hearing Officer's Op. at 20.)[4] After stating that the parents' experts testified that an ABA-based curriculum was appropriate and superior to the curriculum preferred by HCPS, the State Hearing Officer decided that "[n]o comparative weighing of their testimony is appropriate because (1) each witness is entitled to her opinion and (2) there is no real conflict on relevant facts." (*Id.* at 21.) Under *Doyle*, a hearing officer's credibility determinations are to be given due weight where they are normally made. However, because the State Hearing Officer here made no credibility determinations except with respect to Mrs. P., obviously no weight can be given to the State Hearing Officer's absent credibility determination. This is particularly proble-

---

**4.** Hereinafter cited as "SHO Op. at # ."

matic given that the State Hearing Officer is patently wrong: as will be discussed below, there is significant conflict on the relevant facts; the greatest of which is whether the June 16, 2005 IEP was appropriate for JP. *See Z.P.*, 399 F.3d at 298 (appropriateness of an IEP is a question of fact).

Where, as here, the testimony of the witnesses, factual and expert, are at odds over important points, often significantly so, a finding that all witnesses are credible means that disparate, sometimes dramatically opposed, recitations of fact are accepted as true. That is neither possible nor helpful, and it certainly makes it impossible to give any weight to the State Hearing Officer's factual findings.

Of equal importance in an IDEA case, the failure to recite, much less differentiate and evaluate, the opinions of experts makes it impossible to identify the hearing officer's views on the expert evidence. That, of course, makes it necessary for the Court to assess the expert evidence on its own.

The State Hearing Officer did find that Mrs. P. has extensive self-education, including from attendance at several seminars, in autism and education for autistic children. While Mrs. P. does not possess a college degree, and is not trained as a educator or a medical expert, the record bears out that, through considerable self-education, Mrs. P. has developed a commendable understanding of child autism and education for autistic children. The record demonstrates that Mrs. P. has been intensively involved in JP's life and education and as JP's mother, she has an unrivaled understanding of JP. This, of course, does not make her opinions con-trolling as to JP's educational progress and needs. Yet, an independent review of the record shows that Mr. P's testimony is quite credible and is supported by the record, notwithstanding her inherent maternal bias.

Having reviewed the evidence, the State Hearing Officer concluded, "While the parents felt [JP's] IEP as amended did not provide him with educational benefit, none of their expect [sic] witnesses said so; they simply said that an ABA school would give him greater benefits." (SHO Op. at 21.) However, that statement is incorrect. As will be discussed below, many of the parents' witnesses testified not only that an ABA school was better for JP than his placement at Rural Point but also that the August 2004 and June 2005 IEPs at Rural Point were inappropriate for JP.

The State Hearing Officer only made two findings of fact that were not uncontested facts. He found that "During the 2004–2005 school year, [JP] made progress in speech and language, behavior, and academics. (*See id.* at pp. 14, 17–19 and Hanover Ex.3.)" and "[t]his progress was not minimal or trivial." (SHO Op. at 26, Findings of Fact 11 and 12.) These findings were made without any written analysis, and without weighing or discussing the over 1,200 pages of evidence and testimony taken in the administrative hearings. Based on these conclusory findings of fact, the State Hearing Officer concluded that the parents had not met their burden to show by a preponderance of the evidence that HCPS did not provide JP a FAPE in the 2004–2005 school year, and did not offer him a FAPE in the June 2005 IEP.[5]

█ Due to the complete lack of written analysis in the State Hearing Officer's

---

5. The State Hearing Officer also concluded that HCPS had met its burden to prove by a preponderance of the evidence that it provided JP with a FAPE for 2004–2005, and that it did offer JP a FAPE in the June 2005 IEP. Of course, HCPS bore no burden of proof at all, as was recently held in *Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). The Supreme Court's decision in *Weast*, issued November 15, 2005, upheld the

opinion, the Court has no way to judge whether the findings of fact therein were regularly made. Findings of fact 11 and 12 are entirely conclusory, being unsupported by any underlying findings of fact; and, as stated above, the State Hearing Officer was wrong in his observation that the parents' witnesses failed to testify to the inappropriateness of the 2005 IEP for JP at Rural Point. For the foregoing reasons, the Court cannot find that the findings of fact were regularly made; and, therefore, accords no weight to the State Hearing Officer's findings of fact and conclusions of law. Having considered the findings of the State Hearing Officer, and granted them no weight, this "court then is free to decide the case on the preponderance of the evidence, as is required by statute." *Z.P.*, 399 F.3d at 304.

The foregoing conclusion respecting the State Hearing Officer's opinion disposes of the related issue raised by the parents that the State Hearing Officer's opinion violates the parents due process rights because of its failure to address the parents' witnesses testimony and failure to consider the parents' post-administrative hearing points of authority. Because the Court accords no weight to the State Hearing Officer's decision, and has afforded the parents ample and numerous opportunities to brief the Court on the numerous issues presented in this case, the parents' arguments as to the deprivation of their due process rights need not be considered further.

## II. Failure To Implement The 2004 IEP

In Count III of the Complaint, and again in post-hearing briefing, the parents argue that certain accommodations and services contained in the 2004 IEP were not properly implemented or not implemented at all; and, this failure amounts to no implementation whatsoever, and is a denial of a FAPE. As discussed above, the parents are not seeking relief for the 2004–2005 school year when JP was in public school. They are seeking monetary relief for the cost of educating JP at Dominion for the 2005–2006 year. Thus, the so-called "failure to implement" allegations go toward proving that the 2005 IEP was inappropriate. If HCPS did fail to implement material provisions of the 2004 IEP during the 2004–2005 school year, that failure would be probative of whether the 2005 IEP was reasonably calculated to provide educational benefits to JP because the 2005 IEP was essentially the same as the 2004 IEP. With no new proposed accommodations or demonstration by HCPS that the IEP would be implemented better during the 2005–2006 school year, the parents reasonably could expect another year of failed implementation. Therefore, the Court must assess the parents' failure to implement claims.

## A. Applicable Law

The IDEA requires IEPs to include "a statement of the special education and related services and supplementary aids and services to be provided the child." § 1414(d)(1)(A)(iii). Regulations promulgated under this accommodations and services clause state that "each public agency must-(1) provide special education and related services to a child with a disability *in accordance with the child's IEP.*" 34

---

Fourth Circuit's decision, issued on July 29, 2004, on that point. Of course, in this case, the Fourth Circuit's decision was controlling. *Weast v. Schaffer ex rel. Schaffer,* 377 F.3d 449 (4th Cir.2004). The State Hearing Officer's lack of currency with the IDEA law that governs this case is as disquieting as is his opinion's superficial (and largely erroneous) factual component.

C.F.R. § 300.500 (emphasis added). The Secretary of Education has interpreted these regulations to require that "[t]he public agency must ensure that *all* services set forth in the child's IEP are provided, consistent with the child's needs as identified in the IEP." Notice of Interpretation, 34 C.F.R. Pt. 300, App. A. Question 31, 66 Fed.Reg. 347666 (emphasis added).

■ The Fourth Circuit has not had occasion to examine the issue whether the failure to implement some or all of an IEP constitutes denial of a FAPE. However, the Fifth Circuit, in *Houston Independent School District v. Bobby R.*, 200 F.3d 341 (5th Cir.2000) *cert. denied,* 531 U.S. 817, 121 S.Ct. 55, 148 L.Ed.2d 23 (2000), addressed this question, and developed a legal standard by which to assess the failure to implement claims. *See also Manalansan v. Bd. of Educ. of Baltimore City,* 2001 WL 939699, 2001 U.S. Dist. LEXIS 12608 (D.Md.2001) (finding denial of a FAPE based on the standard articulated in *Bobby R.).* In *Bobby R.,* the Fifth Circuit wrote:

> to prevail on a claim under the IDEA, a party challenging the implementation of an IEP must show more than a *de minimis* failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities *failed to implement substantial or significant provisions of the IEP.* This approach affords local agencies some flexibility in implementing IEP's, but it still holds those agencies accountable for material failures and for providing the disabled child a meaningful educational benefit.

*Bobby R.,* 200 F.3d at 349 (emphasis added). Several other courts of appeals and district courts have adopted this standard and it is a sensible and sound approach to the issue. *E.g. Melissa S. v. Sch. Dist. of Pittsburgh,* 2006 WL 1558900, *2 (3d Cir. 2006) (adopting *Bobby R.* standard); *Neo-*

*sho R–V School Dist. v. Clark,* 315 F.3d 1022, 1027 (8th Cir.2003) (citing *Bobby R.* with approval); *Schoenbach v. District of Columbia,* 309 F.Supp.2d 71, 83 n. 10 (D.D.C.2004) (citing *Bobby R.* standard as basis for stating that a failure to implement is not a *per se* violation of the IDEA). The *Bobby R.* standard makes clear that merely failing to implement some *de minimis* component or components of an IEP does not constitute the denial of a FAPE. Rather, for a failure to be legally significant (*i.e.* material), the parents must show "the school board or other authorities failed to implement substantial or significant provisions of the IEP." *Bobby R.,* 200 F.3d at 349.

However, the Fifth Circuit qualified its standard by stating in a footnote that the inquiry into what constitutes a "substantial or significant provision" requires both looking *ex ante* and *ex post* to determine whether, notwithstanding the alleged failures to implement the IEP, the child nevertheless received educational benefit. *Id.* "Thus, *one factor* to consider under an *ex post* analysis would be whether the IEP services that were provided actually conferred an educational benefit." *Id.* at n. 2 (emphasis added).

In *Bobby R.,* the LEA failed to provide the student with a speech therapist for a substantial portion of the 1994–1995 school year, and failed to provide him with a special pedagogic method for dyslexic students including highlighted and modified texts, taped lectures, and an alphabetic phonics program for two months of the 1995–1996 school year, all things that had been promised in the student's IEPs. However, the court found that "the significant provisions of [the student's] IEP were implemented, and, as a result, he received an educational benefit." *Id.* at 349.

In *Manalansan,* the IEPs of the student required that he be supervised at all times

because his disabilities (cerebral palsy, hydrocephalus, and a seizure disorder) affected his balance, mobility and motor skills. 2001 WL 939699 at *1. However, no aide was provided for the first five days of the school year; and, by February 15th, the aide had been absent for 15 school days, late for 35 days, and frequently left early. *Id.* at *2. At one point, the student was knocked over in the hall by a group of boys, necessitating surgery, and even then no aide was provided when he returned. The court found that the presence of the aide was a substantial and material provision in the IEP because "the aide provides assistance for all classroom activities and makes it possible for him to be maintained in the general educational setting." *Id.* at *11–12.

In this matter, the parents allege that HCPS failed to implement the 2004 IEP in three respects:

(1) while the 2004 IEP included a referral for an Oral Motor Assessment, that assessment was not timely done, and the recommendations made in the assessment were never implemented;

(2) while the use of the discrete trial method was promised in the accommodations section of the 2004 IEP (as part of the settlement agreement), the discrete trial method was inadequately implemented by an undertrained education aide; and

(3) although the 2004 IEP and HCPS policy encouraged parental involvement in their child's education, including visiting the classroom, HCPS deprived the parents of this ability when HCPS prevented the parents from video taping JP's speech therapy class and, after catching Mrs. P. video taping JP on the Rural Point playground without the permission of HCPS, partially banned the parents from coming

on Rural Point's campus without permission.

As discussed below, HCPS argues that HCPS either properly implemented the provisions as they were stated in the IEP, or the failure to do so was either justified or immaterial to JP's progress.

**B. Oral Motor Skills Assessment**

■ Before the 2004–2005 school year, the parents wanted HCPS to conduct an oral motor skills assessment on JP. In a document entitled "Prior Written Notice" in the August 2004 IEP, under the category labeled "Description of any other factors that are relevant to HCPS's proposal or refusal," the document states "[r]efer [JP] for further testing to assess oral motor and ability to participate in PE."

HCPS did not make the agreed upon referral. On October 5, 2004, Mrs. P. wrote Martha Thompson, the head of special education for several HCPS schools including Rural Point, to convey Mrs. P.'s concerns that JP was demonstrating much more aggressive, disruptive behavior in school, had regressed behaviorally, and wanted some behavioral testing done so an intervention plan could be implemented. The email also states that Mrs. P. hoped that the speech therapists were moving ahead with oral motor skills testing.

The IEP team met on October 14, 2004 to discuss JP's behavioral situation and to work on an intervention plan. At that time, they briefly discussed the oral motor skills issues. Lori Levy, one of JP's two speech therapist at Rural Point, testified that an oral motor assessment assesses one's physical capacity to articulate words. Levy stated that because, at the beginning of the school year, JP was still adjusting to the new school environment and because Rural Point's goal was to increase his speech output, the speech therapist, Levy and Debbie Augustine, agreed that an oral

motor assessment would not provide much useful information at that point in the year. Notes taken by Debbie Augustine from the October 14 meeting show that the IEP team had decided that an "oral motor assessment was not necessary @ this time as the focus is on speech/lang output." (HCPS–12)

On October 20, 2004 the team held another IEP meeting. The team did not discuss the oral motor skills testing apparently because, as Levy testified, HCPS personnel believed the issue had been resolved. However, afterwards, the parents once again requested in writing that the motor skills testing be conducted. Only after the parents submitted the report of JP's private speech therapist, who recommended that JP's oral motor skills be assessed, did HCPS initiate the assessment. Thus, on October 28, 2004, three months after stating that JP would be referred, HCPS finally referred JP for that assessment.

Augustine and Levy conducted the test over eight sessions on November 4, 8, 9, 10, 15, 16, 19, and 20, 2004. They concluded that JP's oral skills were basically normal except that he had some weakness in his tongue and jaw instability. (*See* HCPS–37, p. 2.) Although they recommended exercises for these impairments, they also concluded that exercises to enhance oral motor skills would have minimal impact on improving his speech and language because JP lacked the ability to self-monitor. Testimony demonstrated that self-monitoring is the ability to hear one's self mispronouncing words and make appropriate corrections. Many autistic children initially lack this ability. Augustine and Levy recommended that JP's classroom teachers implement the exercises later in the year. The record contains only an undated copy of the Oral Motor Assessment, and so it is unclear when it was completed. However, the parents did not receive it until early March 2005. On March 9, 2005, the IEP team agreed that the IEP would be amended to implement the exercises. However, although the IEP team met once again before the June 16, 2005 meeting, the exercises were never implemented in the IEP or JP's curriculum.

■ The failure to implement these exercises does not alone constitute a failure to implement a substantial or significant provision of the IEP. The August 2004 IEP only included a promise to refer JP for oral motor assessment. That assessment began in early November 2004, only two months after JP commenced at Rural Point, and evaluation was completed on November 22, 2005. While this delay is *de minimis*, Rural Point's failure to provide the parents with the assessment until March 2005 is of greater concern. However, although HCPS never followed through with its March 9, 2005 proposal to implement accommodations and objectives related to the oral motor skills assessment into JP's IEP (HCPS–66), the mouth exercises were not a substantial provision of the IEP because JP was found to have basically normal oral motor skills, and because the Rural Point speech pathologists believed that JP would derive little benefit from the exercises until he learned to self-monitor. Given the deference that must be accorded to the reasoned opinions of professional educators, *M.M.*, 303 F.3d at 533 (quoting *Springer v. Fairfax Cty. Schl. Bd.*, 134 F.3d 659, 663 (4th Cir.1998)), the Court finds that the delay in the assessment of JP's oral motor skills and its failure to implement the mouth exercises was not material.

## C. Discrete Trial Method

■ The parents also allege that HCPS promised but failed properly to im-

plement the use of the discrete trial method. The record demonstrates that discrete trial method is central to the ABA instructional method and tracks a child's progress by recording data that chronicles a student's performance on each discrete component of the task. One discrete trial consists of posing the task to the child, providing prompting and fading if needed, and reinforcing the child if the child succeeds. The nature of the child's response—correct, incorrect, prompted—is recorded on data sheets, which are kept routinely and in standardized form. Even the type of prompt used—full physical, part physical, point, gestural, verbal—is recorded. (See HCPS2–4 for examples of the discrete trial data sheets.) After a certain time period, the instructor graphs the data to assess the child's progress towards a particular goal. The use of standardized data collection methods enables graphing, whereas non-standardized data cannot be graphed. Janet Lachowsky, the parents' expert in ABA therapy, testified that "if you don't graph, you're not doing ABA." (9/29TR.–29.)[6]

The accommodations section of JP's IEP includes "direct one-on-one instruction to include opportunities for the discrete trials where appropriate." (HCPS–3, p. 24.) It goes on to state that JP will have a "[t]rained instructional assistant to support J[P]' programs. Training will entail methods such as repetition, data collection, step by step methods that is [sic] proven to work with children with autism. HCPS will arrange for the aide to receive training from a Certified Behavior Analyst from a program such as the Faison School or a comparable program...." (*Id.*) Clarifications attached to the IEP state that:

1. [JP] will receive support from a one-to-one instructional aid who receives

training in methods to work with children with autism. HCPS will arrange for the aide to receive training from a Certified Behavior Analyst from a program such as the Faison School or a comparable program in Fredericksburg with which Hanover County Public Schools is already conducting similar training sessions.

4. [JP] will receive academic instruction in a self-contained setting. The setting will include opportunities for [JP] to receive discrete trials when and where the instructional personnel deem appropriate all, of course, designed to meet [JP's] individual educational needs ....

(HCPS–3, p. 29b.) These clarifications were part of the settlement agreement that became part of the 2004 IEP.

From the parties filings and the parents' testimony, it is clear that the parties have very different views of what these provisions promised JP. HCPS states that only the opportunity for discrete trials, to be implemented at the discretion of JP's instructors, was to be provided to JP. HCPS focuses on the "where and when the instructional personnel deem appropriate" language in the provisions and insists that HCPS retained discretion on when and where to implement discrete trial technique.

The parents argue that these provisions directed HCPS to provide JP with ABA style data collection. Discrete trial method is a key component of ABA therapy, but it is not the only key component of ABA therapy. However, the record demonstrates that discrete trial method is primarily used in ABA therapy. Certainly, the fact that the provisions state that the aide will be trained by a Certified Behav-

---

**6.** Citations to the transcripts from the due process hearing are noted by [month]/ [day]TR.-[p.#] to designate the month and date of the hearing and page number.

ior Analyst from a program such as the Faison School, which is a speciality school for children with autism that uses ABA therapy, confirms that the purpose of the discrete trials would be to track JP's progress in the same manner as used in ABA therapy. While at Spiritos, JP had received ABA therapy with much success. When the parents agreed to return JP to HCPS, they wanted HCPS to provide JP with a program that would best duplicate the Spiritos program's success. Thus, clearly the intent of the parents in drafting the clarifications was to provide JP with discrete trial method, as used in ABA therapy.

Considering the facts leading to the discrete trial method provision and the record as a whole, the Court finds that it was the obligation of HCPS to provide an aide trained in that method and to make informed, good faith assessments as to when the method was to be used. Further, considering JP's success at Spiritos using ABA and the parents decision to return JP to HCPS on the condition that HCPS make efforts to emulate the methods used there, the Court finds that the discrete trial method provision was a significant provision in the 2004 IEP.

Mr. P. testified that the parents requested at least ten times to see the discrete trial data, but that HCPS never provided it. Mr. P. testified that he wanted to see the data to be able to assess the progress, or lack thereof, his son was actually making at Rural Point under the 2004 IEP. Finally, after months of frustrated requests, the parents received the data in June 2005, after they had filed their due process complaint.

Had discrete trial data been recorded properly and consistently in accordance with proper ABA standards, the data would have been very helpful in tracking JP's educational progress. The record permits the reasonable inference that more specific and accurate data on JP's educational development would have enabled more specific and accurate tailoring of JP's curriculum and goals, which likely would have led to greater educational gains by JP. Thus, if discrete trials had been implemented for each, or at least most, of JP's goals, the discrete trial technique would certainly have been a substantial and significant component of JP's IEP.

The discrete trial provision clearly grants significant leeway to HCPS to implement "discrete trials when and where the instructional personnel deem appropriate." (*Id.*) But, that leeway does not afford HCPS the discretion not to employ the discrete trial method at all, or to do so ineffectively when it was employed. With this in mind, it must be determined if HCPS lived up to its promises.

Consistent with the IEP, HCPS provided JP with a one-on-one instructional aide and had the aide attend a few training sessions at the Faison School in discrete trial technique. However, the aide only received six days of training which, according to all witnesses who were knowledgeable on the subject, was insufficient to be able to competently implement the discrete trial method. No witness for HCPS testified to the contrary.

The record shows that HCPS attempted to implement the discrete trial method. That, of course, shows that HCPS decided it was appropriate to do so. However, a comparison of the discrete trial data sheets with the testimony about how they are to be prepared demonstrates that they are woefully inadequate. Janet Lachowsky, the parents' ABA expert, testified that the data that was collected by HCPS was incorrectly done under ABA standards, and that it was useless in assessing JP's progress. The data, as presented in HCPS's exhibit, was taken sporadically as opposed

to regularly, and the tasks that were given to JP are not recorded on the sheets. Consequently, there is no way to compare over time JP's progress on any one task. (*See* HCPS2–4.) On the record as a whole, the Court finds that HCPS did not satisfy its obligation under the IEP's discrete trial method provision. Qualitatively, its efforts were of no value because the data generated from the discrete trials that were done is sporadic, not properly recorded, not graphed, and HCPS appears not to have used the data in educating JP. Indeed, it appears to only have used the data as an exhibit supporting its case in the due process hearing.[7]

As previously explained, the discrete trial method provision of the 2004 IEP was a significant one and the breach of its terms was a substantial and material failure to implement the IEP because it deprived HCPS of the ability to use the method in assessing JP's performance under the IEP and in revisiting JP's curriculum consistent with the results of his efforts and progress.

### D. Parental Participation

■ In Count VI of the parents' Complaint, the parents allege that HCPS denied the parents' a meaningful opportunity to participate in their son's education in violation of HCPS policy and § 1400(c)(4)(B) of the IDEA. While the Complaint frames this issue as an actionable violation of the IDEA, later briefing frames the issue as an actionable failure to implement the 2004 IEP. As agreed upon by the parents at oral argument, the Court will treat this issue as part of the parents' failure to implement claim, which go to-

ward proving their argument that the June 2005 IEP was inappropriate.

In December 2004, Mrs. P. sought to video tape JP in his speech therapy sessions so that Mrs. P. could implement the teacher's techniques at home. HCPS denied the request stating that, although HCPS encouraged parents to observe their children at school and participate in the child's education, HCPS policy does not "contemplate parents visiting for the purpose of videotaping their child in the school setting." (HCPS–45.) While HCPS invited Mrs. P. to come in to discuss JP's instruction, HCPS believed that video taping would be "an unnecessary intrusion for our staff." (HCPS–45.) However, HCPS presented no evidence showing that there was an antecedent written or oral policy that prohibited video taping educational sessions of HCPS students, disabled or otherwise.

Notwithstanding HCPS's December letter, on May 12, 2005, Mrs. P. stood outside the Rural Point playground and videotaped JP playing on the playground. In response, HCPS wrote a letter to the parents stating that this conduct was in violation of both HCPS policy and the December letter. HCPS prohibited the parents from coming on Rural Point's campus except if given prior permission, to pick up and drop off JP, for parent-teacher conferences, medical emergencies, or events generally open to the school community. (HCPS–85.)

The parents allege that these actions violated their right to have meaningful participation in JP's education. At the due process hearing, both parents testified that they felt their ability to meaningfully par-

---

7. The Court's conclusions here do not impede its discussion later in this Memorandum Opinion of the data as analyzed and graphed by Mr. P. for the purposes of assessing JP's progress during the 2004–2005 school year.

Unlike HCPS, Mr. P. did endeavor to make use of the data, even if, due to its sporadic collection, not all portions of the data provide statistically sufficient data points upon which to base conclusions.

ticipate in JP's education had been restricted, and they felt they could not continue an amicable education relationship with Rural Point if the prohibition remained.[8]

■ In their Complaint, the parents cite the IDEA to support their argument that the denial of parental participation in the education of a disabled child can constitute denial of a FAPE. The parents cite § 1400(c)(5)(B) of the IDEA, which is part of the Findings of Congress and states that educational outcomes for disabled students can be improved by ensuring "parents have meaningful opportunity to participate in the education of their children at school and at home." *Id.* As a Finding of Congress, this provision does not create a substantive right. Instead, at most, it expresses a purpose of the statute. *See Pennhurst v. Halderman,* 451 U.S. 1, 19, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (finding that a provision in the nature of a congressional "Finding" of the "Developmentally Disabled Assistance and Bill of Rights Act" did not create a substantive right binding on the States).

In addition, in support of their argument, the parents cite two cases: *Hall v. Vance County Board of Education,* 774 F.2d 629, 634 (4th Cir.1985), stating that "*Rowley* recognizes that parental participation is an important means of ensuring state compliance with the Act", and *CM v. Board of Education,* 241 F.3d 374, 380 (4th Cir.2001), stating that "an equally important IDEA policy is to encourage parents to participate in the education of their disabled children and to provide them with the procedural tools to enforce the mandate of the Act." While parental participation is a required component of the IDEA, the cases cited are discussing the participation that must be afforded parents in the development and review of an IEP. *Hall,* 774 F.2d at 634; *CM,* 241 F.3d at 380; *see e.g.* § 1414 (IEP development); § 1414(d)(1)(B),(3) (opportunity to participate in IEP meetings), § 1415 (procedural safeguards and administrative and judicial review). Nowhere does the IDEA state that parents have a right to videotape their children at school, or even a right to be present in the classroom during instruction. Thus, the IDEA cannot be construed to support the parents' denial of parental involvement claim.

HCPS policy states that HCPS "invites and encourages parents to be involved closely with their students' education, including making visits to classrooms to view the academic environment ...." (Pl.'s Brief On The Failure To Implement An IEP As Denial of a FAPE at 4.) This is a discretionary policy that accords a privilege to parents, not a right; and that privilege may be circumscribed in the manner chosen by HCPS so long as HCPS does not violate any other existing right. Given the deference that courts are instructed to extend to public educators as to public education matters, *M.M.,* 303 F.3d at 533, it is not this Court's place to decide whether denying Mrs. P. the ability to videotape JP in his speech therapy session was permissible.

Moreover, the record demonstrates that HCPS invited and permitted the parents to observe JP at least weekly at school, held eleven meetings with the parents over the course of the school year, sent numerous emails, letters, notes, used a communication log to report to the parents on JP's progress, and held many telephone calls with the parents. This record evidence

---

8. At the additional evidence hearing before this Court, and in telephone conferences since that hearing, HCPS has repeatedly stated that *if JP returns to Rural Point, the prohibition will be lifted provided the parents agree to adhere to HCPS's policies.*

shows that HCPS afforded the parents ample input and opportunities to participate in JP's education. Accordingly, the Court finds that HCPS's actions did not constitute a material failure to implement the IEP nor a denial of a FAPE.[9]

### III. Did JP Make Progress During The 2004–2005 Year?

The parents make a multi-step argument for why the June 2005 IEP was not reasonably calculated to provide JP with educational benefit. As discussed above, they first argue that HCPS failed properly to implement the 2004 IEP. They then argue that JP did not make progress during the 2004–2005 school year at Rural Point under the 2004 IEP. In fact, they state that, at best, JP made no progress and, at worst, he regressed. They then correctly state that the proposed June 2005 IEP was the same as the 2004 IEP, except for the addition of three goals. Because, the parents argue, JP had made no progress under the 2004 IEP, JP could not reasonably be expected to make progress during the 2005–2006 school year under essentially the same program.

As a related point, the parents showed that JP had made extensive progress during his year at Spiritos, and that they had bargained for, and received, promises that HCPS would educate JP, in significant part, by emulating the method that had succeeded at Spiritos. And, as discussed above, HCPS failed to implement certain significant provisions in the IEP. HCPS argues that, during the 2004–2005 school year, JP made progress that was sufficient to make the June 2005 IEP reasonably

calculated to provide JP with educational benefit.

The IDEA and the *Rowley* standard would be meaningless if, before a court would enforce rights guaranteed by the IDEA, the parents of a child who is regressing or not progressing are required to stand by and watch while a school system implements the same IEP that has provided no educational benefit in the preceding year. Accordingly, the Court believes, and the parties have agreed, that, if the facts of this case show that JP did not make progress during the 2004–2005 school year, it cannot be said on the facts of this case that the June 2005 IEP was reasonably calculated to provide a FAPE to JP.[10]

### A. Benchmark Scores On The IEP

One measure of JP's progress over the year is from benchmark grades written on JP's IEP. JP's goals are set forth in the 2004 IEP. (HCPS–3). In summary, goal 1 dealt with following a schedule, goals 2, 3, and 4 were reading-related goals, goal 5 dealt with addition and subtraction, goal 6 dealt with measuring and geometric shapes, goal 7 sought to teach JP to count change up to five dollars, goal 7a dealt with "more than" and "less than" concepts, goal 8 dealt with telling time, goals 9, 12, and 16 sought to improve JP's spontaneous conversation, use of language to accomplish tasks, and ability to answer basic questions, goal 10 dealt with following verbal directions, goal 13 dealt with fine motor skills like using a pencil and paper, and goal 15 and 17 sought to teach JP methods

---

9. It is of concern that the prohibition ran to both parents when only one of them offended the letter of instruction. However, the parents have not based their argument on this point and it need not be addressed.

10. Before addressing the evidence that was presented, the Court notes that neither the parents nor HCPS called as a witness JP's special education teacher, who presumably has the greatest knowledge about JP's performance in his academic subjects during the 2004–2005 year.

to regulate his behavior and calm himself down.

Each IEP goal sheet includes a place for Rural Point staff to give JP grades that state his progress for each month he is in school. The possible grades are:

**SP**—student demonstrates Sufficient Progress to achieve the goal within the duration of the IEP;

**ES**—student demonstrates Emerging Skill but may not achieve this goal within the duration of the IEP;

**IP**—student has demonstrated Insufficient Progress to meet this goal and may not do so within the duration of the IEP;

**NI**—student has Not been Instructed on this goal;

**M** student has Mastered this goal.

(HCPS–3, at p. 7.) The record does not state who at Rural Point actually wrote these grades into JP's IEP over the course of the year. In addition, no explanatory comments are included with the notations, making it difficult to assess their reliability. With no way to assess their veracity or accuracy, the grades are conclusory by nature and are of little utility for that reason.

However, taken at face value, the benchmark grades show that, on goals 1, 2, 4, 5, 6, 7, 7a, 8, 12, 13, 15, and 17, JP made "Sufficient Progress." On goal 3, the score was "Emerging Skill" until April, at which point the score was "Sufficient Progress" through the remainder of the year. No benchmark scores were recorded for goal 9 or goal 16, and goals 11 and 14 were deleted before the IEP was signed. A summary of the scores, broken down by months is presented in Appendix A.

At the due process hearing, Mrs. P. testified about her assessment of JP's abilities on each of the goals. She stated he made progress on goals 1, 2, 5, 13, and 17.

On goal 8, she stated he could tell time with sufficient skill before he started at Rural Point, but that he made no further progress while at Rural Point. For all other goals, Mrs. P. testified that JP did not make sufficient progress. Thus, there is an extreme divergence of views between the parents and HCPS on JP's status over the year. A side-by-side comparison of Mrs. P.'s testimony on the benchmarks and the scores on the IEP is presented in Appendix A.

**B. Progress In Speech And Language**

Like many autistic children, JP has particular difficulty with speech and language. During the years involved in this case, JP rarely engaged in so-called "spontaneous utterances," which is spontaneously speaking without being ask to do so. The record shows that in 2004 JP had a very limited ability to talk, had a limited but expanding vocabulary, did not use multi-word phrases, could not fully articulate many of the words that he did know, and consequently found his challenges with speech and language very frustrating. Indeed, while JP had significant difficulty with other basic and academic skills, the record demonstrates that his difficulties with speech and language presented perhaps his central challenges. And, the record shows that proficiency in speech and language is an essential prerequisite to learning other subjects and to deriving educational benefit.

Accordingly, the measure of his progress in speech and language is a critical component in assessing JP's overall progress during the 2004–2005 school year. His progress in speech and language can be assessed based on educational testing done in 2004 and 2005 and on evidence submitted by HCPS, including a speech

and language therapy log and anecdotal testimony from HCPS personnel.

### 1. Speech And Language Testing

In August 2004, Rebecca Bucci, MS, CCC–SLP,[11] of Virginia Rehabilitation Center, conducted a Speech and Language Evaluation on JP (then age 10 years 7 months). In May 2005, Debbie Augustine and Lori Levy, HCPS's speech-language pathologists and JP's speech and language therapists at Rural Point, conducted a Speech–Language–Hearing Evaluation of JP after his 2004–2005 year at Rural Point. In June 2005, Childrens' Hospital tested JP's speech and language at the request of Dr. Colleen Kraft. The results of these Speech and Language Evaluations are summarized in Appendix B.

Each of the test administrators were unable to test JP in some categories. See App. B. Scores were obtained for Receptive Picture Vocabulary, Expressive Vocabulary (One Word Picture Vocab Test–R), and for categories tested using either the Preschool Language Scale–4 test ("PLS–4") and the Oral and Written Language Scale test ("OWLS"). Bucci, at the August 2004 testing, and Children's Hospital, at the 2005 testings, used the PLS–4 test, while HCPS used OWLS at the May 2005 testing. PLS–4 tests for expressive communication, auditory comprehension, and total language while OWLS categories are oral expression, oral comprehension, and total language. While OWLS and PLS–4 are not the same tests, Lori Levy, HCPS's speech pathologist, testified that these two test provide results that can be compared.

The tests show that between August 2004, when Bucci tested him, and May 2005, when HCPS tested him, JP progressed ten months on the receptive pic-ture vocabulary test, regressed three months on the expressive vocabulary test, regressed five months on the expressive communication (PLS–4)/oral expression (OWLS) tests, regressed seven months on the auditory comprehension (PLS–4)/oral comprehension (OWLS) tests, and regressed six months on the total language test (PLS–4/OWLS). The scores from Children's Hospitals tests in February and June 2005 reflect similar results. Indeed, if one compares JP's scores in August 2004 to his scores on Children's Hospital's tests in June 2005, JP had regressed further in every category just discussed except for receptive picture vocabulary, which showed JP had progressed by one year and nine months between August 2004 and June 2005. See App. B. By any measure, with the exception of JP's receptive picture vocabulary skills, these scores show significant regression in speech and language.

### 2. Evidence From HCPS

Although HCPS bears no burden of proof, HCPS presented the testimony of Lori Levy and Debbie Augustine, JP's speech therapists, to rebut the evidence on speech and language presented by the parents. These were HCPS's primary witnesses in support of its claim of progress. JP received speech and language therapy five times per week, of which one time was in a group session, with Augustine teaching three classes and Levy teaching two per week. On the cold record, Levy and Augustine both present as qualified speech therapists.

Levy and Augustine kept a speech therapy progress log (the "log") that purports to note what and how JP did in each therapy session. The parents argue that HCPS presents no "objective" evidence to support any of HCPS's arguments. By "objective," the parents really mean empir-

---

**11.** CCC–SLP stands for Certified Clinical Competence in Speech Language Pathology.

ical, standardized, comparable, test-based evidence. HCPS claims that the log is "objective" data, and HCPS is correct in the sense that the log states what the therapists observed and wrote down. But, it is not empirical, comparable, or standardized as are the test scores obtained in the speech and language testing. Although JP had speech therapy five times per week, the entries in the log skip many days. The record contains no explanation for the incomplete, somewhat erratic recording in the log, and at oral argument, HCPS could not explain why the log is this way.

The log is more like a diary than a systematic recording of JP's curriculum and progress. The log entries are not referenced to the goals of the IEP so direct assessment of progress on IEP goals is not easily achieved. However, testimony by Levy stated and analysis of the log shows that the skills recorded in it relate to the types of tasks set forth in many of the IEP goals. Levy testified that the therapy sessions were geared towards the relevant IEP goals. The log says things like "Sent. + + -+ -+-+," which testimony explained indicates how many answers JP got correct and wrong when working on sentences. However, the log does not state what question was being asked; therefore, few qualitative conclusions can be drawn from JP's responses. Often, the log states something like "Christmas vocab 7/9," which Levy testified meant that JP had correctly answered seven of nine questions about vocabulary words relating to Christmas. However, sometimes, the log only describes what task was done on a particular day without stating how JP did.

Because the log's data was not tallied up in some manner that would make possible comparisons over time, it is extremely difficult to form any conclusions based on the log. However, from reading the entire log, some conclusions are possible. JP is reported to have answered more questions correctly than incorrectly throughout the year. This seems to be true in the areas of calendar skills, sequential concepts, antonyms, pronouns, vocabulary, naming body parts, sentences, yes/no questions, and "what" and "when" questions. Nevertheless, for the reasons stated above and for other reasons, it is difficult to tell whether JP was making progress. For example, JP was getting calendar questions 100 percent correct in October and continued to get between 75–100 percent correct throughout the year. But, there is no indication or testimony as to how the questions changed over time, whether the questions became more difficult or easier, or whether they were repetitive and thus easier to answer. Without information of that sort, it is not possible to make any conclusions as to progress on calendar skills. In some task categories, testimony showed that the level of difficulty changed. For example, JP did not begin working on antonyms, a concept that is more difficult, until mid-way through the year. Likewise, the vocabulary words changed throughout the year: for example, in the fall, he did Halloween words, then Thanksgiving words, then Christmas, Easter, and summer-related words. As the year progressed, JP seemingly continued to get more answers correct than incorrect. Accordingly, while the log is a very inexact and non-standardized assessment of JP's work throughout the year, the log, viewed as a whole, indicates that JP was making some progress in at least some areas worked on in the speech therapy sessions.

As discussed above, while the speech log is not keyed to the IEP goals, analysis of the record and the IEP goals suggests that the following goals would be worked on in the speech therapy sessions: 2, 3, 4, 9, 10, 12, 15, 16, and 17. If JP's progress

in the speech therapy sessions, as demonstrated by the log, represents progress on those speech/language-related goals, then JP made progress in at least nine of the fifteen enacted goals. In addition, the parents testified that JP achieved goal 1 and 13 and made sufficient progress on goal 5. As stated above, Mrs. P. testified that JP made no progress on goal 8 (telling time) while at Rural Point. Goals 11 and 14 were deleted at the beginning of the year. In sum, if the speech log accurately reflects JP's progress on the speech/language-related goals, and that is a big "if," and combined with the goals on which the parents admitted JP progressed, JP made progress on twelve of the fifteen original goals contained in the August 2004 IEP.

In addition, Levy and Augustine testified in support of the appropriateness of the 2004 IEP, and that JP had made progress on his speech and language goals while at Rural Point. Levy testified that the 2004 IEP goals were appropriate for JP and calculated to provide him educational benefit. Levy believed that, as of December 8, 2004, JP was meeting his speech and language goals, even if he had not mastered them. Levy stated that, when JP arrived, he engaged in frequent echolalia, but by the end of the year, he had reduced the echolalia when in familiar surroundings. She stated that JP initially needed name placards to remember other childrens' names; but, eventually, he learned the names, and no longer needed the placards. Levy also testified that, at the beginning of the year, JP would not initiate any conversation; but by the end of the year, he would spontaneously say hello in the hall when passing by Levy. Levy stated that JP improved his usage and understanding of pronouns and negation, increased his participation in group activities, learned lyrics to new songs (apparently, he very much enjoyed singing), learned to request to get up from the group work table instead of doing so without asking, could sit for 45 minutes in a group, improved his understanding of spatial positions, time, memory, quantity, and became one hundred percent accurate in calendar skills.

Levy also testified that JP's agitation decreased, and he learned to curb his obsessive need to have doors closed by first asking to close them. Levy testified that JP made good progress toward the communication goals on his IEP, and demonstrated "communicative intent," *i.e.* the desire to express himself.

In defense of the 2005 IEP, Levy opined that JP had made progress during the year, and that a more restrictive environment, such as an ABA school, would deprive JP of social interaction with typical students, which is important and necessary for speech development. As explained below, Levy's opinion as to both points was negated by other evidence.

Debbie Augustine, JP's other speech therapist, largely echoed the testimony of Lori Levy. However, Augustine acknowledged that JP has very limited verbal output, makes very few spontaneous utterances, and had difficulty with yes/no questions and pronouns. Inexplicably, the log actually shows that JP did very well with these last two areas. This contradiction undercuts the reliability of the log, and it adversely affects the weight given to Augustine's testimony.

Augustine testified that JP should not be at an ABA-type school (such as Dominion or Spiritos) because he needs social interaction with typical students to develop his language skills. She stated that socialization is not just important for its own sake, but also as a language developmental tool. Imitation and emersion in age-appropriate language are crucial components to learning language. However, Augus-

tine's testimony was significantly impeached when, on cross examination, she admitted that a basic understanding and competence in language is a necessary prerequisite to social interaction, and that JP essentially lacked the basic language skills needed to communicate with his peers. This impeachment significantly damages the weight and credibility of Augustine's testimony, as well as Levy's corresponding testimony, that the reason Rural Point was appropriate for JP was because it included socialization components necessary to improve his language skills. The record shows that, if JP could not communicate with his peers socialization would do him little good, and could actually cause him frustration, anxiety, and emotional trauma. Augustine's testimony is also lacking in credibility given that in 2003–2004 JP did. so well at Spiritos, an ABA-type school, where socialization was minimal.

On March 3, 2005, the IEP team conducted a "Re-evaluation/Triennial Meeting Summary." It is a very brief document with only one or two sentence responses to each question. The author states "[m]aking good progress on his IEP goals but possible problems with language use and reading comprehension." (HCPS–63.) This statement seems conclusory; although it is likely based on the progress scores in the IEP, which, in turn may be based on the speech therapy progress log. So, to the extent, if any, that the IEP progress scores are accurate and reliable, so too is the Triennial statement.

## C. Dr. Hayes' Educational Testing

The parents offered evidence of educational testing by Dr. Michael Hayes that assessed JP's academic development be-

tween 2003 and 2005. Dr. Hayes, a clinical Ph.D. psychologist at Dominion Behavioral Healthcare, tested JP during three different time periods. He first assessed JP on August 6 and 11 and September 5, 2003; then again on May 6 and 13, 2004; and again on April 18, 2005. Dr. Hayes tested JP in JP's school in 2003 and 2004, and in Dr. Hayes' office, which was unfamiliar to JP, in 2005.[12]

Dr. Hayes administered three tests to JP: the Woodcock Johnson III ("WJ–III"), which has seven subject areas, the Visual Motor Integration test ("VMI"), and the Peabody Picture Vocabulary Test III ("PPVT–III"). Both VMI and PPVT–III test a child's nonverbal abilities. In the VMI test, the child uses a paper and pencil to copy a figure. PPVT–III tests receptive language: the tester says a word and the child identifies a picture most closely resembling that word. The WJ–III tests seven different academic skills. Dr. Hayes' results are summarized in Appendix C.

Summing up the results of his testing, Dr. Hayes testified that JP made more progress between 2003 and 2004 while at Spiritos than he did between 2004 and 2005 while at Rural Point. Having not conducted a statistical analysis on his results, Dr. Hayes testified that he could not testify for sure whether the 2003–2004 gain was statistically significant. However, without conducting a formal statistical analysis, he stated that between 2003 and 2004 (while JP was at Spiritos) JP made statistically significant progress in the following areas:

- Letter/Word Identification
- Spelling
- Receptive Vocabulary (PPVT–III)

12. There was some testimony at the due process hearing that, because JP was unfamiliar with the office, his scores that day may have been lower than otherwise expected. However, Dr. Hayes stated that the results were within normal deviation levels and could be reliably compared.

- Word Attack
- Calculations

In contrast, JP did not show statistically significant progress in:

- Applied Problems
- Visual Motor Integration

Dr. Hayes testified that, between the 2004 and 2005 testing rounds (while JP was in HCPS), JP made progress in:

- Letter/Word Identification -
- Applied Problems—(he stated it "could be significant")
- Word attack—(he stated it "could be significant")
- Visual Motor Integration

In contrast, Dr. Hayes did not believe JP made statistically significant progress in:

- Spelling—no change
- Academic Knowledge -
- Receptive Vocabulary—no change

Dr. Hayes stated that testing of the calculations category was for observational purposes, and could not be relied on. With that caveat in mind, the scores show that JP made significant progress in that area. JP went from an age equivalency of 6 years 3 months in 2003 to eight years one month in 2004, to nine years in 2005. Dr. Hayes testified that in 2003, JP could not add without a number line. In 2004, JP could do some addition problems without the number line, but needed it for most problems. In 2005, JP could do some addition without the number line, and could subtract with the number line. However, he could not do problems outside the number line's range.

In general, Dr. Hayes said that, over the 2004–2005 year, JP made some progress in some areas while he regressed in others. Dr. Hayes stated that he did not know enough about either ABA or JP to recommend an educational strategy. HCPS argues that, because Dr. Hayes is not an educator, and had not observed JP in JP's educational environment nor attended any IEP meetings, his testimony should be given less weight. However, those points do not adversely effect the weight of Dr. Hayes' testimony because Dr. Hayes' testified solely to show JP's relative progress in the areas tested, and Dr. Hayes was qualified as an expert to testify on that subject. The Court therefore finds no reason to discount Dr. Hayes' testimony and, indeed, finds it to be balanced and credible.

The results of the testing performed by Dr. Hayes shows that JP made progress in some areas and regressed in others while under the 2004 IEP. Taken as a whole, JP's progress, considering advancement and regression, can be characterized, at best, as minimal.

### D. The Parents' Other Experts' Testimony On JP's Progress

The parents submitted the opinions, contained in letters, of several physicians that treated JP in support of their argument that JP did not progress under the 2004 IDEA. These physicians were Dr. Ronald David, Dr. Colleen Kraft, Dr. Jerry Kertzinel, and Dr. Mary Megson. As HCPS points out, none of the parents' physicians who reported on JP actually observed JP at Rural Point, participated in the IEP meetings, or testified at the hearing. However, HCPS does not contest that the physicians are qualified experts in their respective fields.

Dr. Colleen Kraft is a Board of Pediatrics certified Pediatrician. Since getting her M.D. at the Medical College of Virginia ("MCV") in 1986, Dr. Kraft has practiced pediatric medicine in numerous settings. She was the President and CEO of Richmond Pediatric Associates, and now runs a company she started called Medical Homes Plus, Inc., which provides home-

based medical treatment for children with special needs, including autism. Based on her sixteen years of interpreting hundreds of educational tests, Dr. Kraft was qualified by the State Hearing Officer as an expert in interpreting Woodcock Johnson scores and the results of speech and language evaluations. Dr. Kraft continues to work with Richmond Pediatric Associates, and JP has been a patient there for five years. She has been JP's primary care physician since May 2004. (P1–4, curriculum vitae of Dr. Kraft.)

In a May 12, 2005 letter, Dr. Kraft reported that:

> J[P]'s standard scores in all areas of testing were approximately the same as his test scores from 2004. J[p] demonstrated decrease[d] standard scores in the areas of academic knowledge, spelling, and passage comprehension.
>
> Both Dr. Hayes and J[P]'s parents have noted the correlation between J[P]'s negative behaviors and his academic progress. J[P] displays negative behaviors in order to avoid a task; at Spiritos, these behaviors were addressed and not reinforced, leading to increased academic progress. My concern is that J[P]'s current academic placement does not adequately address his behaviors, and therefore his academic progress is stagnant.
>
> I believe that given this data, J[P] needs an environment which will support his academic progress. This clearly is not being provided with his current placement. Placement in a ABA program such as the Faison School or Spiritos would better achieve these goals.

(HCPS–90; P1–4.) Although Dr. Kraft states that an ABA placement would "better achieve" JP's goals, and does not state that ABA is the only place where JP can make progress, she clearly states that J[P] has not made progress under the 2004

IEP, and that the instruction pursuant to that IEP is unable to prevent his negative behaviors which lead to his stagnation.

The parents also submitted a report dated May 24, 2005 from Dr. Jerry Kartzinel, a pediatrician who has specialized in autism since 1990, and who has known JP since JP was five. Dr. Kartzinel was the Chief of Pediatric Services at Nellis Air Force Base, is Board Certified in Pediatrics, a fellow in the American Academy of Pediatrics and American College of Pediatrics, and has published articles on pediatric autism. (P1–5, curriculum vitae of Dr. Kartzinel.) Dr. Kartzinel stated that "[i]t seems that J[P] has not made progress over the past year, in fact in some areas he has fallen behind." Dr. Kartzinel also opined that "[i]t is medically necessary that J[P] participate in ABA therapy that will provide a Certified Behavioral Analyst on a one to one basis." (HCPS–90 at p. 5.)

The parents also submitted a June 9, 2005 report from Dr. Mary Megson, M.D., FAAP, a pediatric autism specialist. Dr. Megson opined that JP's speech and language functioning regressed from three years eleven months in May of 2004 to three years nine months in February 2005. That, of course, was under the regime proscribed by the 2004 IEP. She also stated that, between 2004 and 2005, JP's Woodcock Johnson scores remained the same at four years two months, his expressive one word picture vocab score showed four months of regression, and his expressive language score showed six months of regression. These assessment are based on her interpretation of Dr. Hayes' test results and the results of the speech and language testing discussed above.

In conclusion Dr. Megson stated:

> IMPRESSION: Autism. Very concerned about his regression over the past nine months related to school .... ABA one-on-one intervention is the only

technique that has been shown consistently to work for these children and he should be offered this through the public school system in my opinion to help him make this progress.

(P1–6.).[13]

The parents also submitted the views of Dr. Ronald David, who is JP's pediatric neurologist, and is a specialist in medical and educational treatment for autistic children. He has served as a fellow in Pediatric Neurology at the Mayo Graduate School of Medicine (1967–1971), he has been an Associate Clinical Professor of Pediatrics (Pediatric Neurology) at MCV since 1979, an Emeritus member of the Learning Disabilities Council (1984–present), and he has authored several texts and numerous articles on pediatric neurology. (*See* HCPS–70 curriculum vitae of Dr. David.)

Dr. David opined that

[i]t appears that Hanover Schools have not been able to provide for [JP], in my professional opinion, a setting conducive to exploring his islands of competency that can be turned later on into gainful employment. A special school catering to this specific type of child would be in my opinion appropriate and necessary.

(HCPS–90, at p. 2.) Dr. David had previously written a prescription for JP to receive ABA therapy.

In sum, the opinions of the experts essentially echo what the testing data shows: that on the whole, JP, at best, made no progress during the 2004–2005 year, and at worst, regressed several months. HCPS urges that these opinions must be disregarded, or at least discounted, because none of the experts are educators

and none observed JP at Rural Point. Those objections are without merit. The experts are well-qualified in their respective fields and their fields involve the assessment and treatment of autistic children. The record shows the extent of their knowledge of JP, and certainly they are able to assess objective testing results. Thus, their opinions are valuable evidence probative of JP's progress.

### E. Discrete Trial Data

As discussed above, the parents also presented testimony, record evidence, and reports based on the discrete trial data that JP's aide recorded over the course of the 2004–2005 school year. Discrete trial method is the intensive teaching method that micro-analyzes a student's performance on tasks, records the data in a standardized form, and graphs the data to assess progress over time. JP's IEP stated that JP would receive "direct one-on-one instruction to include opportunities for the discrete trials where appropriate" provided by an ABA trained aide. (HCPS–3, p. 24)

As explained in Part II.C above, testimony demonstrated that the discrete trial data in the record has minimal, if any, value to HCPS or in satisfying the 2004 IEP because the data was collected sporadically and never graphed by HCPS. However, Mr. P., who has a electrical engineering degree and whose employment for more than fifteen years has involved analyzing large amounts of data, compiled the data and graphed it. At the due process hearing, Mr. P. testified about, and introduced as evidence, the results of his work. Unfortunately, the State Hearing Officer did not give Mr. P. a sufficient opportunity

---

**13.** Dr. Megson also notes that JP has mastered only four of the fifteen goals in his IEP. Of course, mastery of goals is not required under *Rowley*. *Rowley* only requires that

there be educational benefit as measured by non-trivial progress. *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034.

to make the record clear or to explain fully the method and meaning of Mr. P.'s analysis. At the additional evidence hearing held on July 20, 2006, the Court asked Mr. P. to testify about his results to clarify the record.

Mr. P.'s process can be summarized as follows. The discrete trial data sheets, which are found in the record as HCPS2–4, provide answer grids keyed to the IEP goals and sub-goals where the aide was to record JP's answers to each question. For example, IEP goal two has two sub-goals, called 2.1 and 2.2, and there is an answer grid for each sub-goal on the discrete trial sheets. Mr. P. first determined how many days data was recorded for each sub-goal. He determined that data was recorded fifty seven percent of the time, where one hundred percent would mean data was recorded for each sub-goal on each day of the school year. Mr. P.'s graph of the days data was recorded shows that data was very inconsistently recorded from September to April, but from April to June, the data was consistent enough to be considered to be statistically significant to graph.

The answer grids on each discrete trial sheet contain ten boxes, representing ten questions. HCPS divided JP's academic subjects into three groups: language, math, and what Mr. P. labeled as "SMF$T," which represents JP's IEP goals relating to counting money, measurements, telling time, and other life skills. Mr. P. then assessed the number of times, for each academic subject group, that JP got ten out of ten answers correct, nine out of ten answers correct, eight out of ten, etc. The results show that in Language, JP got ten out of ten 123 times and got less than ten out of ten correct (*i.e.* 9 or less out of ten) no more than 45 times per category. He got ten of ten correct 250 times in math while he got less than ten

out of ten correct no more than 29 times per category. JP got ten of ten correct 217 times in SMF$T, and got less than ten out of ten correct no more than 65 times per category.

Although Mr. P. is not a trained educator, he testified that one would expect a child's scores to range: the child would get, for example, three out of ten answers correct as many times as he got seven out of ten correct and would get one out of ten and ten out of ten less frequently. This outcome is based on the theory that, when a child is first taught something its answers will be mostly incorrect, then will be mostly correct, then will be all correct when the child masters the task, and then will return to mostly incorrect when a new task is introduced. In contrast, JP got everything correct on average three times as frequently on language and four times as frequently on math and SMF$T as he got any ratio of less than all questions correct. Based on his observations of JP at home, Mr. P. simply does not believe the discrete trial data to be accurate. He believes the aide greatly inflated JP's performance. That is not illogical considering that the aide was inadequately trained.

Because Mr. P. has no education training, the Court finds his statements about how the distribution of scores ought to have come out to lack the weight of expert opinion. However, the graphs speak for themselves: if JP was getting ten out of ten answers correct three to four times as frequently as not, JP would seemingly have been making tremendous progress on his IEP goals. Not even the HCPS witnesses testified that JP was making that type of progress, and the objective testing by Dr. Hayes shows that JP was not making that type of achievement either. For this reason, as well as the numerous other reasons discussed above, the Court finds that the discrete trial data is not an accu-

rate reflection of JP's progress. The flaws in the discrete trial data also permit the inference that HCPS's assessment of JP's progress is inflated.

### F. Provision Of A FAPE

In *Rowley*, the Supreme Court addressed the purpose and legislative history of the "Education for All Handicapped Children's Act" (the "EAHCA"), the predecessor to the IDEA. The Court explained that "[n]oticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children." 458 U.S. at 189–90, 102 S.Ct. 3034. The Court determined that the EAHCA did not require that the "services so provided be sufficient to maximize each child's potential commensurate with the opportunity provided other children." *Id.* at 198, 102 S.Ct. 3034 (internal quotations omitted). Instead, the Court found that the EAHCA guaranteed a "basic floor of opportunity" to disabled children by guaranteeing access to a free, appropriate public school education. *Id.* at 201, 102 S.Ct. 3034. The Court held that "[t]he 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to *provide educational benefit* to the handicapped child." *Id.* (emphasis added).

Since *Rowley*, the Fourth Circuit has elaborated on the *Rowley* "educational benefit" standard. In *Hall*, the Fourth Circuit found that:

*Rowley* recognized that a FAPE must be tailored to the individual child's capabilities and that while one might demand only minimal results in the case of the most severely handicapped children, such results would be insufficient in the case of other children. Clearly, Congress did not intend that a school system could discharge its duty under the EAHCA by providing a program that produces some minimal academic advancement, no matter how trivial.

774 F.2d at 636. In *Conklin v. Anne Arundel Board of Education*, 946 F.2d 306 (4th Cir.1991), the Fourth Circuit wrote that, in passing the EAHCA and the IDEA, Congress sought to address the "practical necessity of providing America's neglected handicapped children with some form of meaningful education." *Id.* at 308 (internal citations omitted). Thus, the Fourth Circuit has interpreted the "educational benefit" required by *Rowley* to constitute "some form of meaningful education" that enables more than "trivial" or "minimal academic advancement." And, this educational benefit must be assessed based on the educational capacity of each individual student because, as the Supreme Court explained, "[i]t is clear that the benefits obtainable by children at one end of the [disability] spectrum will differ dramatically from those obtainable by children at the other end, with infinite variations in between." *Rowley*, 458 U.S. at 202, 102 S.Ct. 3034.[14]

14. In its post-hearing briefing, HCPS spends considerable time citing language with the intention of showing that the "basic floor of opportunity," *Rowley*, 458 U.S. at 201, 102 S.Ct. 3034, guaranteed by the IDEA is rather low. While the pre-amended version of the IDEA governs this case, the Court notes aspects of the recent amendments to the IDEA, which became effective on July 1, 2005. *See* P.L. 108–446. The Findings that became the amended statute state that "the implementa-

tion of this chapter has been impeded by low expectations, and an insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities." 20 U.S.C. § 1400(c)(4) (effective July 1, 2005). The Findings further state that:

Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by:

The record in this case does not contain any explicit assessment of JP's intellect, such as an I.Q. test. However, the testing by Dr. Hayes demonstrates that JP made far more progress between 2003 and 2004 than he did between 2004 and 2005. Indeed, in no tested category did JP make any less than four months progress during the 2003–2004 school year, and in all but one tested area he made more than a half year's progress. These objective test scores demonstrate that JP has the capacity to make academic progress given an appropriate learning environment.

This conclusion is also supported by the statements of the parents' experts. Dr. Kraft testified that JP demonstrated the capacity to learn academic skills and to make a school year's academic progress in one school year. Janet Lachowsky, the director of Spiritos, testified that JP was able to make more than twelve months of progress in the year he was at Spiritos. She stated that, while at Spiritos, JP "actually did a wonderful job and showed us that he is capable of learning language and using language. He is capable of learning academic skills... at a slower rate than neurotypical children, but he is capable of learning that." (9/29Tr.–41.) Thus, JP's progress at Rural Point under the 2004 IEP must be assessed against his capacity to progress, as demonstrated by the record.

The speech and language educational testing demonstrates that, in all categories except for Receptive Picture Vocabulary, JP regressed between August 2004 and May/June 2005, (*i.e.* while operating under the 2004 IEP). In Expressive Vocabulary, JP regressed somewhere between three and four months, depending on whether one uses the May 2005 HCPS test date or the June 2005 Children's Hospital test date. On Expressive Communication (PLS–4)/Oral Expression (OWLS), JP regressed between five and six months. On Auditory Comprehension (PLS–4)/Oral Comprehension (OWLS), JP regressed seven or eight months. On Total Language (PLS–4/Owls), JP regressed one year and six months. Dr. Megson deemed the drop in these scores significant, and stated that they showed that JP had regressed. (P1–6.)

While Lori Levy and Debbie Augustine testified that, from their observations and work with JP, they believed he progressed, these conclusions are refuted by the objective testing that they conducted themselves in May 2005 as compared to the August 2004 speech and language test. In addition, the parents' significantly impeached the testimony of Augustine, and the concordant testimony by Levy, when Augustine admitted that JP lacked the basic language skills needed to develop improved language skills through socialization. This impeachment undermined the credibility of much of Augustine's testimony. Although the speech and language log seems to show that JP got more answers correct than incorrect, as discussed above, very few accurate conclusions about progress can be garnered from analysis of the log. As a non-empirical, non-standardized

(A) having high expectations for such children ... to
 (i) meet developmental goals and, to the maximum extent possible, the challenging expectations that have been established for all children; and
 (ii) be prepared to lead productive and independent adult lives, to the maximum extent possible;

*Id.* at § 1400(c)(5). The legislative history of the EAHCA and the IDEA show quite clearly that Congress did not enact the statutes for the purpose of meeting the minimal level of service urged by HCPS.

record that does not even record what was being assessed during a session, the Court finds the log minimally helpful in assessing progress. Thus, the Court concludes that JP did not receive educational benefit in speech and language during the 2004–2005 school year because the record shows that he did not make progress in that area. To the extent that JP's performance in speech and language reflects JP's performance on the relevant speech and language-related 2004 IEP goals (a proposition that HCPS advances), JP did not make progress on those goals.

The testing conducted by Dr. Hayes also shows that JP made, at best, no more than trivial progress in the academic areas tested by Dr. Hayes. Indeed, the "Present Level of Performance" written by HCPS in the June 2005 IEP states that Dr. Hayes' testing shows that JP's level remained unchanged from the previous year in Reading Comprehension, Spelling, and Receptive Vocabulary. Dr. Hayes testified that he believed that between 2004 and 2005, JP did not make statistically significant progress in Academic Knowledge, while JP may have made progress in Applied Problems, Word Attack, and Visual Motor Integration. Although JP made progress on calculations, Dr. Hayes stated that those results were observational only, not reliable. Dr. Hayes testified that JP made progress on Letter–Word Identification, but that his progress was significantly less than during the prior year. Indeed, between 2003 and 2004, JP made eleven months of age-equivalency progress in Letter–Word Identification while making only five months the following year. Thus, Dr. Hayes testified that JP did not make progress in four categories, definitely made progress in one, and may have made some progress in three. Based on his expertise in pediatric psychology and educational testing, the Court finds Dr.

Hayes's test results and his testimony to be credible and reliable.

The parents' physician experts, including Dr. Kraft, Dr. Kartzinel, and Dr. Megson concluded from Dr. Hayes's results that JP regressed in several areas and did not make progress in others while at Rural Point under the 2004 IEP. The Court finds, based on their education, training, and experience, that the opinions of these physicians are credible, and finds credible and reliable their interpretations of Dr. Hayes' test results. Accordingly, the Court finds that, in the academic areas tested by the WP–III, JP did not make progress during the 2004–2005 school year. To the extent that the 2004 IEP seeks to provide JP with educational benefit in the academic areas tested by Dr. Hayes, the Court finds that the parents have proved by preponderance of the evidence that the 2004 IEP did not provide JP with educational benefit.

The benchmark scores written on the August IEP do not refute this conclusion. Even though these benchmark scores state that JP was, in the estimation of their author, making sufficient progress in some areas, there is no way to determine the veracity or reliability of the benchmark grades. The mere fact that an educator writes "sufficient progress" on an IEP does not make it so even when according educators their proper deference. *M.M.*, 303 F.3d at 533 (quoting *Springer v. Fairfax Cty. Schl. Bd.*, 134 F.3d 659, 663 (4th Cir.1998)) (deference due to educators as to their education-related opinions). That is especially so where, as here, the scores are defined in conclusory terms and they conflict both with objective test results and the opinions of experts knowledgeable in the field of pediatric autism who are qualified to assess test results for autistic children.

The testimony of HCPS's other witnesses, Andrea Earl, JP's occupational therapist, Ramey Catron, JP's mainstream fourth grade teacher, and Michael Warner, the school psychiatrist at Rural Point also does not refute the parents' evidence. Earl testified that JP made progress in occupational therapy, and the parents do not dispute that fact. However, JP received occupational therapy twice a month for thirty minutes a session. JP's progress in occupational therapy is simply not a material issue in the assessment of whether JP received a FAPE at Rural Point under the 2004 IEP. The testimony of Catron was essentially irrelevant as Catron's only interaction with JP was during recess, lunch, specials (art, music, etc.), and Pledge of Allegiance time. Catron, therefore, could shed almost no light on JP's progress toward his IEP goals and lunch, recess, and Pledge time are not material in this case to the provision of a FAPE. Similarly, although Warner did some testing on JP to design the November 22, 2004 behavioral intervention plan, Warner otherwise had very limited interaction with JP, and his testimony did not add anything material to HCPS's case.

 Having found that the parents have proved, by a preponderance of the evidence, that JP did not make progress during the 2004–2005 school year at Rural Point, the Court also finds, by a preponderance of the evidence, that the June 2005 IEP was not reasonably calculated to provide JP with educational benefit for the 2005–2006 school year because the June 2005 IEP was essentially the same IEP as the August 2004 IEP, including its addenda goals. By a preponderance of the evidence, the Court finds that providing JP with more of the same for the 2005–2006 school year would not have provided JP with educational benefit. For the foregoing reasons, the Court finds that the June 16, 2005 IEP did not provide an appropriate education as required by the IDEA. Once parents have proved that an IEP offered to their child by an LEA is inappropriate, to obtain reimbursement for their unilateral private placement, the parents have the burden of proving the private placement they selected is proper under the IDEA. *Florence County Schl. Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993).

### G. Least Restrictive Environment

 The IDEA seeks to educate disabled children with non-disabled children "to the maximum extent possible." § 1412(a)(5)(A). "Special classes, separate schooling, or other removal ... occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* "The 'proper inquiry' in every mainstreaming case is 'whether a proposed placement' is appropriate under the Act." *Doe v. Arlington County Sch. Bd.*, 41 F.Supp.2d 599, 604 (E.D.Va.1999). However, assessment of whether the child is placed in the least restrictive environment is "ultimately a goal subordinate to the requirement that disabled children receive educational benefit." *Hartmann*, 118 F.3d at 1002. Having found that the 2005 IEP did not provide JP with educational benefit, the Court need not address whether Rural Point was the least restrictive environment for JP.

### IV. Dominion Is An Appropriate Placement

#### A. Legal Standard

 In *Carter*, the Supreme Court held that parents are entitled to reimbursement for a private school placement only if the court finds that "the public placement violated the IDEA and that the

private school placement was proper under the Act." 510 U.S. at 15, 114 S.Ct. 361. Thus, the Court must determine whether the parents' private placement, the Dominion School for Autism ("Dominion"), was appropriate for JP for the 2005–2006 school year in that it provided JP with educational benefit. *See Burlington v. Dept. of Educ. of Massachusetts,* 471 U.S. 359, 370, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985) (stating test for private placement reimbursement); *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034 (standard is provision of educational benefit). Because a private placement is private, the private school is not required to comply with the IDEA's procedural requirements.

 Although the Fourth Circuit has not had the opportunity to address the issue, the Sixth Circuit has held that parents are not required to prove that the private placement they have selected is the least restrictive environment. *Knable ex rel Knable v. Bexley City Schl. Dist.,* 238 F.3d 755, 770 (6th Cir.2001). Basing its decision on the reasoning set forth in *Carter,* the Court held:

> parents who have not been treated properly under the IDEA and who unilaterally withdraw their child from public school will commonly place their child in a private school that specializes in teaching children with disabilities. We would vitiate the right of parental placement recognized in *Burlington* and *Florence County* were we to find that such private school placements automatically violated the IDEA's mainstreaming requirement.

*Id.* (internal citations omitted.) The Sixth Circuit's holding in *Knable* is sound. Like the Sixth Circuit, this Court recognizes that reimbursement for such speciality schools will impose significant costs on school districts. As the Supreme Court stated in *Carter:*

There is no doubt that Congress has imposed a significant financial burden on States and school districts that participate in IDEA. Yet public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the child in an appropriate private setting of the State's choice. This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims.

*Carter,* 510 U.S. at 15, 114 S.Ct. 361.

## B. Findings Of Fact As To The Private Placement

At the June 16, 2005 IEP meeting, the parents rejected the proposed June 2005 IEP, and asked HCPS to pay the cost of a private placement. At some point between June 16, 2005 and September 12, 2005, the parents decided to enroll JP at the Dominion School for Autism, a new school, and not the Spiritos School or the Faison School, two other speciality schools well-respected in the Richmond area. JP began at Dominion on September 12, 2005, the first day that the school was open.

At the time of the due process hearing, Jennifer Woods, the Director of Dominion, testified that she had been a licensed teacher in Virginia for two years. She had taught in Henrico County Public Schools for those two years in an autism classroom. Before that, she was trained at the Princeton Child Development Institute in Princeton, N.J., which is one of the leading centers for ABA therapy for children with autism. She graduated from Ryan University with a degree in psychology and in special education for children newborn through 21, and elementary education, K–8th grade. She is endorsed in Virginia in education and learning disability.

Dominion is fully licensed and certified by both the Virginia Department of Education and the City of Richmond. Before issuing their certifications, each entity inspected Dominion's building, reviewed the qualifications and training of Woods and the other Dominion staff, certified Woods as the director of the school, and reviewed the proposed curriculum for appropriateness for children with autism, including their special needs and the standards of learning goals.

At the time of the due process hearing, Dominion had only two staff members in addition to Woods. One is a teacher licensed in Virginia in special education, who has several special education endorsements, has worked with autistic children for many years, including with ABA training, and serves as the reading specialist at Dominion. In addition, Kristin Mapp, who was completing her undergraduate degree in January 2006 and getting a masters at the same time in special education at VCU, served as a teacher's aide. Wood conducted two weeks of teacher training in, *inter alia*, CPR, ABA, and crisis management prior to Dominion opening.

In the fall of 2005, Dominion did not have an in-house speech therapist, occupational therapist, school psychologist, or other special services providers. However, Wood testified that an enrolled child's parents arranged for these types of services as needed, and the private providers may use the school's premises. Wood testified that this method is typical of private speciality schools. For example, the record shows that the well-respected Faison School uses the same method of welcoming outside providers.

In the fall of 2005, there were three students at Dominion: JP, another autistic student JP's age, and a two and half year old autistic student. Dominion does not accept students older than age 13.

At Dominion, JP received one-on-one ABA therapy all day. In the three weeks that Woods worked with JP, he demonstrated progress in reducing negative behaviors that impinged on learning, and increased his spontaneous utterances. For example, when JP arrived at Dominion, Wood testified that he did not have the ability to state that he had a headache (apparently, he gets headaches often). Dominion was able to teach him how to say "head," identify his head as his head, and to spontaneously say "My head hurts" when he felt that sensation. He could not do this before starting at the Dominion School. Wood testified that JP did not have transition problems when he started at the Dominion School. He was happy and smiling, and as long as he had a schedule so he knew what event was coming next, he did not become anxious. He had not screamed or acted out at the Dominion School in the several weeks before the September due process hearing sessions.

Dr. Kraft, who visited the Dominion School before the September due process hearing sessions, testified that the school was an appropriate placement for JP. At the additional evidence hearing before this Court, Frank Uvanni testified to the appropriateness of the Dominion School for JP. Starting on February 1, 2006, Uvanni became the speech therapist at Dominion. Uvanni has a long and distinguished career working as a speech pathologist and therapist, working first in several of the New York state school systems from 1951—1984. During that time, Uvanni was instrumental in implementing a speech pathology and therapy program in the school districts for which he served. Following his tenure in the New York schools, Uvanni served as a speech pathologist and therapist in the Lewis County General Hospital. He then went into private practice

until 2004, when he worked for two years at St. Joseph's Villa, Richmond, Virginia, a rehabilitation center for children. At the hearing, there was some attempt by defense counsel to sully Uvanni's work record. While within counsel's trial rights, this attempt was both unsuccessful and uncalled-for. Uvanni's fifty-five plus years of work with children with speech and language disabilities speaks admirably for itself. The Court finds Uvanni to be well-qualified and quite a credible witness in the areas in which he testified.

Uvanni testified that JP has made substantial progress in speech and language while at Dominion. Uvanni kept detailed records of what JP did in therapy each day. Uvanni stated that JP is a wonderful child who has a great capacity to learn academic subjects. Uvanni stated that JP entered the Dominion School reading at a primer level, which is a pre-first grade to early first grade level. By the summer of 2006, JP was reading the well-known children's story "Heidi," which is a fourth grade reading level book. Uvanni testified that JP needs help on only three to four words per page. Uvanni also testified that JP is increasingly expressing himself spontaneously. This testimony demonstrates that JP has obtained substantial educational benefit while at the Dominion School.

Kristin Mapp, JP's aide, also testified at the additional evidence hearing. Mapp credibly testified that JP has made significant progress while at the Dominion School and that the school is appropriate for JP.

Testimony by Mapp explained that ABLLS tests basic learner skills needed before a child can be fully integrated into the mainstream educational environment. ABLLS tests a comprehensive panoply of basic skills, including social, academic, and physical skills. The test assesses progress over time. Each skill is given a code and mapped on a code-delineated color coded grid system. Green squares represent the skills the child had at the first testing, orange squares represent the skills the child has obtained since the first testing, and uncolored squares represent skills yet to be obtained. By this system, educators can chart a child's baseline, progress, and unmet needs over time and within various education categories.

The results of the February testing showed that JP could do seventy three discrete skills that he could not do at the September testing. At the same time, JP had not lost any skills that he previously possessed. That is, he did not regress at all. While the results of the ABLLS test were from February 2006, the additional evidence hearing was held July 20, 2006. Mapp testified that JP has gained far more skills since February, although new ABLLS results were not yet available. The results of the ABLLS test are set forth in the record as plaintiff's additional evidence exhibit 5.

In sum, the testimony of Wood, Uvanni, and Mapp, and the results of the ABLLS tests, demonstrate beyond a preponderance of the evidence that JP has obtained educational benefit at the Dominion School. For the foregoing reasons, the Court finds that JP's placement at the Dominion School during the 2005–2006 school year was appropriate as required under the IDEA.

## V. Conclusion

In *Carter*, the Supreme Court held that

[o]nce a court holds that the public placement violated IDEA, it is authorized to 'grant such relief as the court determines is appropriate.' § 1415[(i)(2)(B)(iii) ]. Under this provision, 'equitable considerations are rele-

vant in fashioning relief,' and the court enjoys 'broad discretion' in so doing. 510 U.S. at 15–16, 114 S.Ct. 361 (quoting and citing *Burlington,* 471 U.S. at 374, 369, 105 S.Ct. 1996). Where a court finds that the public placement was inappropriate, and that a unilateral private placement was appropriate, a court may order the LEA to reimburse the parents for the costs of the private placement. § 1415(i)(2)(B)(iii); § 1412(a)(10)(C)(ii). Accordingly, as set forth in the IDEA, HCPS must reimburse the parents for the reasonable costs of educating JP at the Dominion School and any related services and accommodations that would have been covered under the IDEA had HCPS provided JP with an appropriate education during the 2005–2006 school year. In addition, as the prevailing party, the parents are entitled to reasonable attorney's fees as permitted by the IDEA and governing decisional law.

The Clerk of the Court is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

## Appendix A

*Appendix A:* Benchmark grades from JP's 2004 IEP and Mrs. P's assessment

| | 10/7/04 | 11/12 | 12/9 | 2/4/05 | 3/3 | 4/15 | 5/12 | 6/17 | Mrs. P's assessment |
|---|---|---|---|---|---|---|---|---|---|
| Goal 1 | SP | SP | SP | SP | SP | SP | SP | SP | Made Progress (MP) |
| Goal 2 | SP | SP | SP | SP | SP | SP | SP | SP | MP |
| Goal 3 | ES | ES | ES | ES | ES | SP | SP | SP | No—Goal is over-expectation |
| Goal 4 | SP | SP | SP | SP | SP | SP | SP | SP | No—JP lacks comprehension |
| Goal 5 | SP | SP | SP | SP | SP | SP | SP | SP | MP |
| Goal 6 | SP | SP | SP | SP | SP | SP | SP | SP | No |
| Goal 7 | SP | SP | SP | SP | SP | SP | SP | SP | No—JP could count up to $.70 while at Battlefield. Can't count up to $5.00 now. |
| Goal 7a | SP | SP | SP | SP | SP | SP | SP | SP | Not sufficient progress |
| Goal 8 | SP | SP | SP | SP | SP | SP | SP | SP | No—JP was at SP at beginning of year, but made no additional progress. |
| Goal 9 | - | - | - | - | - | - | - | - | No—JP cannot initiate conversation. JP has regressed. |
| Goal 10 | ES | - | - | - | - | - | - | - | No—JP can do only as much as when he left Spiritos |
| Goal 11 | Deleted | Per | | Parents | | | | | |
| Goal 12 (new) | SP | SP | - | - | - | - | - | - | NO—Sub-goal 1: no, 2: no, 3: no, 4: yes—could do it when left Spiritos, 5: no, 6: no, 7: yes—could do it when left Spiritos, 8: no, 9: no—did it better at Spiritos. |
| Goal 13 | NI | SP | SP | SP | M | - | - | - | Mastery |
| Goal 14 | Deleted | Per | | Parents | | | | | |
| Goal 15 | SP | SP | SP | SP | SP | SP | SP | SP | Not sufficient progress—J will repeat "that's okay" but not initiate statement. |
| Goal 16 | - | - | - | - | - | - | - | - | Not sufficient progress |
| Goal 17 | SP | SP | SP | M | - | - | - | - | MP |

**Key:**
ES—Emerging Skill
IP—Insufficient Progress
SP—Sufficient Progress
NI—Not been provided Instruction on this goal.
M—Mastered

## Appendix B

*Appendix B: Speech and Language Testing*

**Appendix B:** *Speech and Language Testing*

Shows: "Standard Score / Year—Month age equivalency" or only "Year—Month age equivalency"

| | August 2004 (Bucci's test) | May 2005 (HCPS's test) | Children's Hosp. Test Feb. 2005 / June 2005 | Change (May/Feb/June) |
|---|---|---|---|---|
| **Receptive Picture Vocab** | <3–0 | 3–10 (using diff. but comparable test than in 8/04) | 3–9 4–5 | +10 /+9 / + (1–5) |
| *Dr. Hayes' Results for Receptive Vocab (PPVT–III) (see chart below)* | 2003: 40 / 3–0 | 2004 46/4–2 '03–04 Change +6/+1–2 | 2005: 44 / 4–2 | '04–05 Change: –2/0 |
| **Expressive Vocab (One Word Picture Vocab Test–R)** | <55 / 3–8 | 55 / 3–5 | NT 3–4 | –3 / –4 |
| **Relational Vocab** | Unable to test | Not Tested | NT | NT |
| **Oral Vocab** | Unable to test | Not tested | NT | NT |
| **Grammatical Understanding** | <3–0 | Tested but not comparable | NT | NT |
| **Sentence imitation** | 3–0 | Not tested | NT | NT |
| **PLS–4\* 1. Expressive Communication** | 2–11 | OWLS\*\*—Oral Expression 40/2–6 | 2–5 | –5/ –6 |
| **PLS–4 2. Auditory** | | Using OWLS— Oral Comp. | | |

| Comp. | | | | |
|---|---|---|---|---|
| | 3–11 | 40/ 3–4 | 3–3 | –7/ –8 |
| PLS–4<br>Total Language | | Using OWLS<br>Total Lang. | | |
| | 3–5 | 40 / 2–11 | NT | NT/ –(1–6) |

\* PLS–4 = Preschool Language Scale–4
\*\* OWLS = Oral and Written Language Scale
NT = Not tested.
*Source:* HCPS–1, HCPS–83

## Appendix C

***Appendix C:** Dr. Hayes's Testing Results*

Shows: "Standard score/year-month age equivalency" and Change in age equivalency.